UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| ATAIN SPECIALTY INSURANCE COMPANY, a Michigan corporation,<br><br>Plaintiff,<br><br>v.<br><br>SAWGRASS HOME SOLUTIONS, LLC., a South Carolina limited liability company; STEVE SWANSON; EMILY SWANSON; and J.M. BURKE CONSTRUCTION, LLC, a South Carolina limited liability company;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CASE NO:   2:23-cv-00166-DCN<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY JUDGMENT

The Plaintiff, ATAIN SPECIALTY INSURANCE COMPANY ("Atain"), files this Complaint for Declaratory Judgment against the Defendants, SAWGRASS HOME SOLUTIONS, LLC ("Sawgrass"), STEVE SWANSON and EMILY SWANSON (collectively, the "Swansons"), and J.M. BURKE CONSTRUCTION, LLC ("JM Burke") and in support, states:

### NATURE OF ACTION

1. This is an action for declaratory relief under 28 U.S.C. § 2201 (2022) and Fed. R. Civ. P. 57 (2022) to establish the absence of coverage under a Commercial General Liability ("CGL") insurance policy issued to Sawgrass, for a lawsuit arising out of alleged construction defects, brought by the Swansons (the "Swanson Lawsuit").

### JURISDICTION AND VENUE

2. Jurisdiction is proper because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interest, and costs.

3. Venue is proper in this district because the events giving rise to the claim occurred here. 28 U.S.C. § 1391(a)(2) (2018). More specifically, this is the district where the underlying action is venued, and where the insured risk lies. Additionally, at least one of the Defendants is domiciled in this district.

4. All conditions precedent have occurred, have been performed, or have been waived.

## THE PARTIES

5. The Plaintiff, Atain, is a Michigan corporation with its principal place of business in Michigan. Atain is a surplus lines insurance company under S.C. Code § 38-45-10, *et seq*. and issued a CGL Policy to Sawgrass.

6. The Defendant, Sawgrass, is a South Carolina limited liability company with its principal place of business in Mt. Pleasant, South Carolina. All of Sawgrass's members and managers are citizens of South Carolina, and none of them are otherwise citizens of Michigan. Sawgrass was named as a defendant in the Swanson Lawsuit, which was filed in Charleston County, South Carolina. Sawgrass is the named insured on the CGL Policy issued by Atain.

7. The Defendants, the Swansons, are South Carolina citizens who are domiciled in Charleston County, South Carolina. The Swansons are the underlying plaintiffs in the Swanson Lawsuit.

8. JM Burke is a South Carolina limited liability company with its principal place of business in Charleston County, South Carolina. All of JM Burke's members and managers are citizens of South Carolina and none are otherwise citizens of Michigan. JM Burke is also named as a Defendant in the Swanson Lawsuit, and has pursued cross-claims against Sawgrass.

## COMMON ALLEGATIONS

9. ***THE SWANSON LAWSUIT***: The Swansons initially filed a lawsuit in the Charleston County Court of Common Pleas, Case No. 2020-CP-10- 05579, against Sawgrass and

others, due to alleged defects in the construction of their residence (the "Residence"). A copy of the second amended complaint, which is the current operative pleading in the Swanson Lawsuit, is attached as Exhibit "A" and is hereinafter referred to as the "Swanson Complaint" or "Swanson Lawsuit."

10. The Swansons allege that Sawgrass was hired by JM Burke and served as its subcontractor and performed work under the supervision and coordination of JM Burke. The Swansons also allege that Sawgrass was responsible for providing air seal verification and blower tests performed at the Residence, among other things. (Ex. A, ¶ 9). The Swansons allege that Sawgrass is one of the "Subcontractor Defendants."

11. The Swansons allege that they hired JM Burke to undertake, supervise, manage and oversee various inspections, renovations and repairs to the Residence. Initially, JM Burke and Subcontractor Defendants were hired to make certain repairs and improvements in Swanson's master bathroom. (Ex. A, ¶¶ 16-17).

12. The Swansons also allege that the scope of JM Burke's and Subcontractor Defendants' work and responsibilities at the Residence expanded substantially. JM Burke and Subcontractor Defendants undertook to perform renovations and improvements, such as fully enclosing a second-floor exterior porch to expand the living space within the Residence. JM Burke, AGL Heating and Air, LLC ("AGL") and Subcontractor Defendants also renovated the home to include a wine cellar, among other improvements. (Ex. A, ¶¶ 19, 22).

13. The Swansons also allege that the Residence was suffering from moisture intrusion, and JM Burke and Subcontractor Defendants agreed and undertook to investigate, identify, and correct all contributing causes and sources of the moisture intrusion affecting the Residence. The Swansons also allege that this expanded scope of work involved substantial destructive exploration

and work throughout a majority of the Residence. Among other things, JM Burke and Subcontractor Defendants removed a substantial majority of the drywall to expose the wall and framing systems in most of the Residence to determine the extent and causes of the moisture intrusion. (Ex. A, ¶¶ 23-24).

14. The Swansons also allege that among other things, JM Burke and Subcontractor Defendants recommended and undertook the following: (a) investigating, identifying, and undertaking to correct all contributing causes and sources of moisture intrusion in the Residence; (b) completely opening up and exposing a substantial majority of the Residence's wall and framing systems in connection with its efforts to locate, identify and solve all of the contributing causes and sources of moisture intrusion in the Residence; (c) replacing and installing various windows; (d) introducing spray foam insulation into the wall systems and ceilings; (e) undertaking to encapsulate attic and porch roof areas on the rear of the home to seal them off from the Residence; (f) replacing the asphalt shingle roof systems on the home and integrating the shingle roof into the existing copper roof over the porch; (g) enclosing a second-floor exterior porch on the rear of the Residence to incorporate it into the living area and integrating new exterior wall framing into the existing roof systems. (Ex. A, ¶ 26).

15. The Swansons allege that by undertaking and actually performing the investigations and work at the Residence, JM Burke and the Subcontractor Defendants owed a duty to the Swansons to perform, supervise, oversee, and direct the investigations and work in a competent and diligent manner, free from defects, in a good and workmanlike manner, and in accordance with applicable building codes, industry standards and as directed. Among other things, Burke specifically had, assumed, and undertook a duty to fully and competently inspect for, identify, and

eliminate all sources of moisture intrusion affecting the Residence and damages caused by the same, all while using their utmost skill, experience, and attention. (Ex. A, ¶ 28).

16. The Swansons allege that JM Burke, Subcontractor Defendants, by undertaking the investigations and actually performing work on the Residence, owed a duty to the Swansons to construct the Residence free from defects, in a good and workmanlike manner, and in accordance with applicable building codes, industry standards and approved plans and specifications. (Ex. A, ¶ 29).

17. The Swansons further allege that upon completing its investigations and the work it recommended, JM Burke assured the Swansons the problems were fully and properly addressed. However, the Swansons allege they have recently discovered and experienced continued moisture intrusion in the Residence, which has resulted in damages to the home. (Ex. A, ¶¶ 30-31).

18. In addition, the Swansons allege Plaintiffs have, through continued investigation, recently discovered that the improvements made to the mechanical system and the recommendations made in connection to the operation of the system generated excessive humidity in the Residence and failed to generate the necessary positive pressure in the Residence. (Ex. A, ¶ 32).

19. The Swansons also allege that JM Burke and the Subcontractor Defendants failed to properly investigate and identify all contributing causes and sources of water intrusion, moisture, and humidity. The Swansons further allege that JM Burke and Subcontractor Defendants defectively repaired and failed to remedy contributing causes and sources of moisture intrusion and humidity that they did identify, such that the Residence continued to suffer from moisture intrusion, high humidity and resulting damages. (Ex. A, ¶ 33).

20. The Swansons allege they engaged experts who identified numerous deficiencies, building code violations, and resulting damages attributable to the investigations and work performed by JM Burke and Subcontractor Defendants, which include, among other things, the failure to identify and correct entry points for moisture intrusion in the standing seam copper roof; and the failure to identify and correct entry points for moisture intrusion in the shingle roof. (Ex. A, ¶ 34).

21. The Swansons allege that latent construction deficiencies resulted in continual exposure to the same generally harmful conditions over time in the form of repeated injurious events and which constitute "occurrences" and compensable damage. Further, the Swansons allege they have been, and will be, deprived of their use and enjoyment of the Residence as a result of the defects, deficiencies, conditions, and necessary repairs. (Ex. A, ¶42).

22. The Swansons also allege that due to the deficiencies in the inspections and work performed by JM Burke and the Subcontractor Defendants, and the resulting damages, the Swansons have expended, and in the future will be forced to expend, significant sums of money to repair the damage, pay for professional fees to investigate the full extent of the problems, design remediation plans and specifications to correct the deficiencies, and implement the remediation and repair plans for the Residence. (Ex. A, ¶ 43).

23. The Swansons also allege that the repair and correction of the defects described involves significant work, effort, expense, design, and implementation of corrective measures that would not be necessary but for Defendants' failure to properly inspect, identify, and correct all contributing causes and sources of moisture intrusion, as well as the defective work it undertook to perform. (Ex. A, ¶ 43).

24. Additionally, the Swansons allege they have suffered, and will continue to suffer, loss of use and enjoyment of the Residence and moving or relocation and utility expenses, which will continue through the time in which repairs are finally completed. The Swansons also allege that the Residence also has suffered damage to personal property and a loss in value and depreciation by virtue of the defects and damages described herein, and the Swansons will suffer a loss of the investment value of funds used by them to mitigate their damages and complete all repairs to the Residence that were made necessary by the errors and omission of Defendants. (Ex. A, ¶¶ 44).

25. The Swansons seek damages for the cost to repair the subject property, consequential damages, including loss of use of the property, lost property value, punitive damages, costs and interest. (Ex. A, ¶¶ 44-45).

26. The Swansons allege the following causes of action against Sawgrass: Negligence/Gross Negligence (Count I), and Breach of Warranty of Workmanlike Service (Count II). (Ex. A, ¶¶ 48-60). The Swansons seek compensatory damages with respect to the alleged damage to the Residence, their personal property, the loss of use of the Residence, and expert and investigation fees. Additionally, the Swansons seek punitive damages for the Defendants' alleged gross negligence.

27. **THE JM BURKE CROSS-CLAIM:** JM Burke, the general contractor for the construction of the Swansons' Residence, was also named as a Defendant in the Swanson Lawsuit. JM Burke filed a cross-claim against Sawgrass. A copy of JM Burke's cross-claim is attached as Exhibit "B."

28. JM Burke alleges it has been sued by the Swansons for alleged defective construction services provided by the cross-claim defendants. (Ex. B, ¶ 85).

29. JM Burke also alleges that a special relationship exists between JM Burke and the cross-claim defendants, by virtue of the involvement of the construction, renovation or repair of the Residence. (Ex. B, ¶ 86).

30. JM Burke alleges that it is without fault for the allegations in the Swanson Lawsuit and that it is liable only for the sole negligence or gross negligence of the Subcontractor Defendants. (Ex. B, ¶¶ 87).

31. JM Burke further alleges that a right to indemnity in favor of JM Burke exists in law or in equity because JM Burke has been exposed to liability and forced to defend itself in the Swanson Lawsuit by virtue of the negligent acts or omissions of the cross-claim defendants. (Ex. B, ¶ 88).

32. JM Burke seeks the following claims against Sawgrass: Indemnity (Count I), Negligence/Gross Negligence (Count II), Breach of Warranty (Count III), and Breach of Contract (Count IV). (Ex. B, ¶¶ 84-114).

33. **THE POLICY:** Atain issued a Commercial General Liability Policy to "Chris Albrecht, d/b/a Sawgrass Home Solutions, LLC" as the sole named insured: CIP170456, effective October 29, 2013 through October 29, 2014 (the "Policy"). The Policy is attached as Exhibit "C."

34. The Policy provides CGL coverage, with limits of $1,000,000 per occurrence and $2,000,000 general aggregate limit, subject to a $500 per claim deductible for property damage. (Ex. C, Declarations & Supplemental Declarations).

35. On the Policy Declarations, Sawgrass's business description is listed as "Residential Improvement." The Policy's Classification Description in the Supplemental Declarations lists "Consultants, NOC," "Contractors-subcontracted work-in connection with

construction, reconstruction, repair or erection-one or two family dwellings," and "Carpentry-construction of residential property not exceeding three stories in height." (Ex. C, Declarations & Supplemental Declarations).

36. The principal insuring agreement in the Policy provides, in relevant part:

**SECTION I - COVERAGES**
**COVERAGE A- BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages, claims expenses and defense costs because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. …

   b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period …

2. **Exclusions**

   This insurance does not apply to:

   b. **Contractual Liability**

   "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

   **(1)** That the insured would have in the absence of the contract or agreement; or

  **(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. …

**j.** **Damage To Property**

"Property damage" to:

 (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

 (6) That particular part of any property that must be restored, repaired or replaced be-cause "your work" was incorrectly per-formed on it….

**k.** **Damage To Your Product**

"Property damage" to "your product' arising out of it or any part of it.

**l.** **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor. …

**m.** **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

 (1) A defect, deficiency, inadequacy or dangerous condition in "your product' or "your work"; or

 (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

- 10 -

> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use. …
>
> **n.     Recall Of Products, Work Or Impaired Property**
>
> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> (1)     "Your product',
> (2)     "Your work"; or
> (3)     "Impaired property";
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it. …

**SECTION V – DEFINITIONS** …

8.  "Impaired property" means tangible property, other than "your product' or "your work", that cannot be used or is less useful because:

    a.  It incorporates "your product' or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b.  You have failed to fulfill the terms of a contract or agreement;

    if such property can be restored to use by the re-pair, replacement, adjustment or removal of "your product' or "your work" or your fulfilling the terms of the contract or agreement. …

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. …

17. "Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

   a. An arbitration proceeding in which such dam-ages are claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent. …

21. "Your product":

   a. Means:

      (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a) You;
         (b) Others trading under your name; or
         (c) A person or organization whose business or assets you have acquired; and

      (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b. Includes:

      (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product', and

      (2) The providing of or failure to provide warnings or instructions. …

22. "Your work":

   a. Means:

      (1) Work or operations performed by you or on your behalf; and

      (2) Materials, parts or equipment furnished in connection with such work or operations.

- 12 -

   b.  Includes:

     (1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

     (2)  The providing of or failure to provide warnings or instructions. …

(Ex. C, Form No. CG 00 01 04 13).

  37.  The Policy includes AF 001 007 11 13, titled "Combined Coverage And Exclusions Endorsement," which provides, in pertinent part:

  **VI.**  **EXCLUSION (Malpractice and Professional Services)**

  The following exclusion is added to Part **2. Exclusions** of **SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and Part **2. Exclusions** of **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** of the **COMMERCIAL GENERAL LIABILITY FORM**:

   1.  This insurance does not apply to:

   2.  Bodily injury" "property damage" or "personal and advertising injury" including payment for loss or defense costs in connection with any claim made against any insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render any professional service by, but not limited to, any Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Agent Broker, or any other service that is of a professional nature. …

(Ex. C, Form No. AF 001 007 11 13).

  38.  The Policy also includes Form No. CG 21 67 12 04, titled "Fungi Or Bacteria Exclusion," which provides, in relevant part:

  **A.**  The following exclusion is added to Paragraph **2. Exclusions** of **Section I - Coverage A - Bodily Injury And Property Damage Liability**:

   2.  Exclusions

This insurance does not apply to:

**Fungi Or Bacteria**

    **a.**    "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

    **b.**    Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption. …

    **C.**    The following definition is added to the Definitions Section:

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi. …

(Ex. C; Form No. CG 21 67 12 04).

    39.    The Policy also includes Form No. CG 24 26 04 13, titled "Amendment Of Insured Contract Definition," which provides, in pertinent part:

The definition of "insured contract" in the Definitions section is replaced by the following:

"Insured contract" means …

    f.    That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf.

> However, such part of a contract or agreement shall only be considered an "insured contract" to the extent your assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.
>
> Paragraph f. does not include that part of any contract or agreement …
>
> (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:
>
>     (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or
>
>     (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or
>
> (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

(Ex. C, Form No. CG 24 26 04 13).

40. Atain agreed to defend Sawgrass for the Swanson Lawsuit, including JM Burke's cross-claims, under a reservation of rights, including but not limited to a reservation of rights to seek a declaratory judgment.

41. Atain now seeks declaratory judgment as to whether it has any obligation to defend or indemnify Sawgrass for the Swanson Lawsuit and JM Burke's cross-claims.

## COUNT I – NO COVERAGE
## PROFESSIONAL SERVICES EXCLUSION

42. Atain incorporates paragraphs 1-41 as its allegations in this paragraph 42 of Count I.

43. The Swansons allege that Sawgrass was hired by JM Burke to provide air seal verification and blower tests performed at the Residence, among other things.

44. Sawgrass was engaged to perform inspection and investigation services as to whether the Residence contained positive air flow, and to identify whether there were any sources of air or moisture infiltration into the Residence, and to ensure that the work performed on the Residence had achieved a positive air flow.

45. The Swanson Lawsuit alleges that Sawgrass failed to properly investigate and identify all contributing causes and sources of water intrusion, moisture and humidity, failure to identify and correct entry points for moisture intrusion in the standing seam copper roof, or the failure to identify and correct entry points for moisture intrusion in the shingle roof.

46. The Policy's professional services exclusion provides that there is no coverage, and no duty to pay for defense costs, for any claim of "bodily injury" or "property damage" arising out of any professional services.

47. The inspection services provided by Sawgrass in the Residence qualify as "professional services" for the purposes of the professional services exclusion.

48. Consequently, Atain has no obligation to defend or indemnify Sawgrass for the Swanson Lawsuit, and JM Burke's cross-claims to the extent the Swanson Lawsuit arises out of Sawgrass's professional services.

**COUNT II – NO COVERAGE**
**NO PROPERTY DAMAGE**

49. Atain incorporates its allegations in paragraphs 1-48 as paragraph 49 of Count II.

50. There is no coverage under the Policy to the extent the Swanson Lawsuit seeks to recover the costs to repair or replace Sawgrass's own work, including the removal of other property to facilitate the repair or replacement of Sawgrass's work.

51. The cost to repair or replace Sawgrass's work does not constitute "property damage" under the Policy. Additionally, the costs to remove and replace other parts of the Swanson

Residence to effectuate the repair or replacement of Sawgrass's work does not constitute "property damage."

52. Alternatively, to the extent the Swanson Lawsuit alleges any "property damage" as defined by the Policy and South Carolina law, Atain is only obligated to pay for its *pro rata* share of such damages based on its time on the risk.

53. Accordingly, there is no coverage under the Policy, and consequently no duty to defend or indemnify Sawgrass. Alternatively, to the extent there is any covered "property damage," Atain's indemnity obligations are limited by its *pro rata* time on the risk.

## COUNT III – NO COVERAGE
## BUSINESS RISK EXCLUSIONS

54. Atain incorporates its allegations in paragraphs 1-53 as paragraph 54 of Count III.

55. There is no coverage for JM Burke's cross-claims under the Policy's Contractual Liability Exclusion (Coverage Part A.2.b.). To the extent JM Burke seeks damages for contractual or equitable indemnity or breach of contract, the Policy does not cover such claims. Furthermore, the as there is no "insured contract" between JM Burke and Sawgrass.

56. There is no coverage to the extent the Swanson Lawsuit seeks damages for "property damage" to any real property on which Sawgrass or its subcontractors performed any work or operations under Coverage Part A.2.(j)(5).

57. There is also no coverage to the extent the Swanson Lawsuit seeks damages for "property damage" to any property that must be restored, repaired or replaced because Sawgrass's work was incorrectly performed on it under Coverage Part A.2.(j)(6).

58. There is no coverage to the extent that the Swanson Lawsuit seeks damages to Sawgrass's product under Coverage Part A.2.(k) ("Your Product Exclusion").

59. There is no coverage to the extent the Swanson Lawsuit seeks damages to Sawgrass's work, arising out of it and included in the products-completed operations hazard under Coverage Part A.2.l. ("Your work Exclusion").

60. There is no coverage to the extent that the Swanson Lawsuit seeks damages for impaired property under Coverage Part A.2.m. ("Impaired Property Exclusion").

61. There is no coverage to the extent that the Swanson Lawsuit seeks damages for any loss, cost or expense incurred by Sawgrass or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of Swanson's product, Swanson's work, or any "impaired property" if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it under Coverage Part A.2.n. ("Recall Exclusion").

## COUNT IV – NO COVERAGE
## FUNGI OR BACTERIA EXCLUSION

62. Atain incorporates its allegations in paragraphs 1-61 as paragraph 62 of Count IV.

63. To the extent the Swansons seek damages in the Swanson Lawsuit due to any exposure to, development of, or growth of mold, mildew, or bacteria inside of the Residence, there is no coverage under the Policy's Fungi or Bacteria Exclusion.

64. To the extent that the Swansons seek damages in the Swanson Lawsuit due to any costs or expenses associated with the removal, repair, remediation, monitoring, or testing for mold, mildew, or bacteria, there is no coverage under the Policy's Fungi or Bacteria Exclusion.

## COUNT V – NO COVERAGE
## INTEGRATED POLICY PROVISIONS

65. Atain incorporates its allegations in paragraphs 1-64 as paragraph 65 of Count V.

66. Atain fully incorporates by reference each and every term, condition, exclusion and endorsement contained within Exhibit C.

67. To the extent any additional term, condition, exclusion or endorsement within the Policy applies to the allegations, facts, or circumstances as discovered in this action or the Swanson Lawsuit, Atain seeks a declaration to the extent such terms, conditions, exclusions or endorsements eliminate or reduce the available coverage for the Swanson Lawsuit.

## REQUESTED RELIEF

**WHEREFORE**, Atain respectfully requests this Court:

a. Take jurisdiction and adjudicate the rights of the parties under the Policy;

b. Find that Atain has no obligation to defend or indemnify Sawgrass for the Swanson Lawsuit and the JM Burke cross-claim under the Policy; and

c. Award Atain all costs it incurs to prosecute this action, as well as any other relief that this Court deems equitable, just, and proper.

Respectfully submitted,

THE LAW OFFICES OF L.W. COOPER JR., LLC

/s/ *Lindsey W. Cooper Jr.*
Lindsey W. Cooper Jr. (Fed. ID No. 9909)
M. Linsay Boyce (Fed. ID. No. 13511)
Dustin J. Pitts (Fed. ID. No. 11952)
36 Broad Street
Charleston, SC  29401
Telephone: 843.375.6622
Facsimile: 843.375.6623
Email: lwc@lwcooper.com
          linsay@lwcooper.com
          djp@lwcooper.com

*Attorney for Atain Spec. Ins. Co.*

Dated: January 12, 2023
Charleston, South Carolina